UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDWIN CRESPO, et al.,

                         Plaintiffs,                            22-cv-7345 (PKC)

    -against-

                                                      OPINION AND ORDER

NEW YORK CITY POLICE
OFFICER JOSEPH FRANCO,
CITY OF NEW YORK,
and other as-yet-unidentified officers
of the New York Police Department,

                          Defendants.

_____

CASTEL, Senior United States District Judge.

            Six individual plaintiffs bring claims against defendant Joseph Franco, a former

police officer, for violation of their due process rights and malicious prosecution. They also

bring a Monell municipal liability claim against the City of New York (the "City"). Franco was

fired by the New York City Police Department ("NYPD") and prosecuted for perjury connected

to several arrests he made in 2017 and 2018. The operative complaint alleges that the criminal

prosecution of Franco is ongoing. (ECF 79 ¶ 32.) The arrests leading to the prosecution of

Franco were not the arrests of any of the six plaintiffs. Plaintiffs were each arrested and

convicted of crimes in the Bronx or Brooklyn and contend that Franco fabricated evidence

against them. Their convictions have been vacated and they contend they have suffered injuries

as a result of violations of their rights protected by the Constitution.

            The City has moved to dismiss the Monell claim. For reasons that will be

explained, the Court will grant the City's motion to dismiss.

1

BACKGROUND

The facts recounted below are taken from the Second Amended Complaint and are presumed to be true for the purposes of this motion.  In re Elevator Antitrust Litigation, 502 F.3d 47, 50 (2d Cir. 2007).  (ECF 79 ("Second Amended Complaint").)

There are six plaintiffs in this case:  Edwin Crespo, Donte Smiley, Tony Serrano, Anthony Washington, Jose Santiago, and Sidney Wray.  (ECF 79 ¶¶ 17-22.)  Plaintiffs allege that they each were arrested at some time between 2006 and 2015 in the Bronx or Brooklyn, and that defendant Franco "caused the arrest" of each of them.  (Id. ¶ 53.)  Plaintiffs further allege that the criminal charges against each of them were based upon false statements or fabricated evidence.  (Id. ¶¶ 55-56.)  They allege that they would not have been arrested but for police misconduct and that, because of it, they were prosecuted by the Bronx and Brooklyn District Attorneys and wrongfully convicted.  (Id. ¶¶ 57-59.)

After Franco was indicted, each of the plaintiffs' cases was vacated by the Bronx or Brooklyn District Attorney's Offices, along with hundreds of other cases in which Franco was involved.  (Id. ¶¶ 8-12, 60-66).[1]  Plaintiffs allege that this misconduct violated their due process rights and constituted malicious prosecution and that such misconduct gives rise to Monell liability against the City.  In support of these claims, plaintiffs make allegations about Franco's pattern of misconduct individually as well as allegations about the wider pattern or policy of misconduct throughout the NYPD.

Defendant Franco was indicted by two separate grand juries in New York County in 2019 for fabricating evidence and committing perjury and was fired from the NYPD following

---

[1] The City acknowledges that each of the plaintiffs' criminal cases has been vacated, with the exception of plaintiff Wray, whose conviction apparently was not vacated due to an administrative error; the City is not moving to dismiss Wray's case at this time while plaintiffs attempt to correct this error.  (ECF 94 at 2 n.3.)

the indictments.  (Id. ¶¶ 5, 6.) [2]  An indictment against Franco included sixteen counts premised to a large extent on assertedly false statements made by Franco regarding arrests made in 2017 and 2018 of three individuals (not parties to this action).  (Id. ¶¶ 27, 29.)  In each of these cases, Franco claimed that he observed defendants selling narcotics, but video footage later refuted his testimony and demonstrated that he could not have observed the conduct in question.  (Id.) Franco memorialized these false statements in NYPD and New York County District Attorney case files and testified falsely before grand juries considering the cases against the arrestees.  (Id. ¶ 29.)

Plaintiffs allege that the Bronx District Attorney's office undertook a review of the cases in which Franco was "the essential witness."  (Id. ¶¶ 7-8.)  In January 2022, the Bronx District Attorney announced that over 250 convictions had already been dismissed because of Franco's "compromised credibility" and that his office planned to request the dismissal of more than 250 additional cases over the following year.  (Id. ¶ 8.)  Similarly, in April 2021, the Brooklyn District Attorney requested vacatur of the convictions of 90 individuals whose convictions "relied on" Franco's testimony.  (Id. ¶¶ 10-11.)  And the City's Special Narcotics Prosecutor also requested case dismissals for 24 individuals who pled guilty to charges that were "directly related" to Franco's work.  (Id. ¶ 12.)

Plaintiffs allege specific examples of other cases in which Franco's conduct was called into question, citing certain cases that the City ultimately settled with other individuals who alleged that Franco had violated their civil rights in arresting them.  (Id. ¶ 25-29.)  For

---

[2] The City asserts and provides links to articles reporting that the case against Franco was dismissed with prejudice in January 2023 after the prosecution failed to turn over evidence.  (ECF 94 at 2-3.)  See Jonah E. Bromwich and Maria Cramer, Botched Prosecution Lets Notorious Ex-Detective Walk Free, N.Y. TIMES (Jan. 31, 2023), https://www.nytimes.com/2023/01/31/nyregion/joseph-franco-nypd-case-dismissed.html (last visited Sept. 12, 2024).  These news articles may not be properly considered on a motion to dismiss.

example, Chinedum Eto alleged that Franco and other officers beat him and provided materially false statements to the New York County District Attorney to justify his arrest and prosecution, leading to his wrongful imprisonment.  (Id. ¶ 26.)[3]  Michael Romain, too, sued the City, alleging that Franco and other officers submitted false allegations to the district attorney to secure Romain's conviction on marijuana charges.  (Id. ¶ 28.)

Plaintiffs assert that Franco's alleged misconduct is not an outlier but instead a result of policies and practices of the City and NYPD.  (Id. ¶¶ 33-35.)  Plaintiffs point to the facts of several cases from 1998 to 2015 as examples of the "hundreds of other cases" in which police officers other than Franco fabricated evidence to secure false arrests and convictions of innocent persons.  (Id. ¶ 35.)  The facts supporting the claim that the misconduct of Franco directed toward plaintiffs was the result of policies or practices of the City's NYPD will be discussed in analyzing the Monell claim.

The Second Amended Complaint does not identify the year of any arrest of any plaintiff, nor the charges they faced or the crimes of which they were convicted.  Instead, plaintiffs lump all of their arrests into a nine-year date range from "2006 to 2015" (id. ¶ 46), and their election to do so thwarts the assessment of each individual plaintiff's claim.  An event that had not occurred until 2010 could not logically have impacted the arrest of a plaintiff in 2006.  This shortcoming falls at the feet of plaintiffs and their counsel, not the defendant City and not the Court.

---

[3] Eto's subsequent civil case against the City, Franco, and other NYPD officers was before this Court.  See Eto v. City of New York, 17-cv-7721 (PKC).  The case settled a few days after Franco filed an answer to the Second Amended Complaint.  (See ECF 40, 41.)

PROCEDURAL HISTORY

Plaintiffs filed their Complaint on July 25, 2022 in the Eastern District of New York.  (ECF 1.)  Plaintiffs thereafter amended their complaint, and the case was transferred to the Southern District of New York.  (ECF 10; ECF 12; Minute Entries, 8/25/22 and 8/29/22.)  The City answered the Amended Complaint.  (ECF 33.)  On November 17, 2023, plaintiffs filed their Second Amended Complaint.  (ECF 79.)  The only claim against the City in the Second Amended Complaint is a single count of Monell liability under 42 U.S.C. § 1983.  Franco answered the Second Amended Complaint, denying the allegations against him and asserting ten affirmative defenses.  (ECF 90.)  Franco also asserted crossclaims against the City for indemnification and recovery of attorneys' fees under Section 50-k of the New York State General Municipal Law.  (Id. ¶¶ 129-33.)  Plaintiffs seek to join in Franco's crossclaims against the City under Rule 20(a), Fed. R. Civ. P.  (ECF 121.)

The City has moved to dismiss the Monell claim against it.  While acknowledging that the alleged criminal conduct of Franco, if true, is "tragic and deplorable," the City asserts that, as a matter of law, it is not liable for plaintiffs' injuries.  (ECF 94 at 1.)

In their opposition brief, plaintiffs assert that they have "only alleged claims against Individual Defendant Franco" and that that they are thus withdrawing the conspiracy and failure to intervene claims.  (ECF 106 at 12 n.3.)  The Court grants the request to withdraw those claims.  See, e.g., Valtchev v. City of New York, 400 F. App'x 586, 588 n.1 (2d Cir. 2010) (summary order).  The Second Amended Complaint refers to "Unknown Officers" of the NYPD as "Defendant Officers."  For the purposes of the motion, the Court construes the Second Amended Complaint as alleging that these non-party officers acted in concert with Franco.

JURISDICTION AND VENUE

Jurisdiction is proper under 28 U.S.C. § 1331 because plaintiffs bring their

Monell claim pursuant to 42 U.S.C. § 1983.  (ECF 79 ¶¶ 14-15.)

Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to plaintiffs' claims occurred in the Bronx, a county

located within this district. [4]  (Id. ¶ 16.)  Specifically, the Second Amended Complaint alleges

that four of the six plaintiffs (Wray, Smiley, Santiago, and Serrano) were arrested in the Bronx

(id. ¶ 53), that the Bronx District Attorney's Office's Conviction Integrity Bureau requested

dismissal of hundreds of convictions in which Franco was involved, including several of

plaintiffs' cases (id. ¶¶ 8-9, 60), that the wrongful arrests of persons other than plaintiffs took

place in the Bronx from 1998 to 2015 (id. ¶¶ 36-41), and that another former NYPD officer

testified about misconduct in the NYPD's Bronx Narcotics team (id. ¶¶ 42).[5]  Both the City and

the NYPD have executive offices in this district where the alleged policies and practices were

allegedly known and accepted.

LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6),

Fed. R. Civ. P., a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing a

---

[4] The action was originally filed in the Eastern District of New York; plaintiffs moved to transfer venue to this district, explaining that plaintiffs' counsel inadvertently had filed the case in the Eastern District and discovered the error before defendants had been served.  (ECF 11.)  The motion was granted without opposition. (ECF 12.)
[5] While two of the plaintiffs were arrested in Brooklyn (id. ¶ 53), and thus in the Eastern rather than the Southern District of New York, neither party has raised the issue of improper venue, so the Court will not raise the matter sua sponte.  See Gomez v. USAA Federal Savings Bank, 171 F.3d 794, 796 (2d Cir. 1999) (citation omitted) ("A district court may not dismiss a case sua sponte for improper venue absent extraordinary circumstances.").

complaint, courts draw all reasonable inferences in favor of the non-movant.  See In re Elevator Antitrust, 502 F.3d at 50.  Legal conclusions are not entitled to any presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.

"[O]n a motion to dismiss [under Rule 12(b)(6)], a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'"  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)).  The Court may take judicial notice of public documents such as news articles and public reports for the fact that they were published but not for the truth of the statements therein.  See Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Company, 28 F.4th 343, 352 (2d Cir. 2022) (quoting Staehr v. Hartford Financial Services Group, 547 F.3d 406, 425 (2d Cir. 2008)) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.  When the court takes judicial notice of documents, it must rely on such documents only for the fact that the statement was made.").

DISCUSSION

The Court concludes that plaintiffs' Monell claim fails because plaintiffs fail to plead an underlying constitutional violation, a necessary element of a Monell claim.  The Monell claim also fails because plaintiffs have failed to allege sufficient factual detail about their own

arrests and convictions to allow the Court to determine whether a similar widespread policy, practice, or custom existed within the NYPD or whether the City failed to discipline officers for such a practice.

I.      Plaintiffs' Municipal Liability Claim under <u>Monell</u> Fails
        <u>Because Plaintiffs Fail to Plead an Underlying Constitutional Violation.</u>

"Under § 1983, '[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law.'" <u>Hernandez v. United States</u>, 939 F.3d 191, 206 (2d Cir. 2019) (quoting 42 U.S.C. § 1983). The Supreme Court has held that a municipality is a "person" that can be held liable under section 1983 for deprivation of constitutional rights. <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 690 (1978). A municipality cannot be held liable on a <u>respondeat</u> <u>superior</u> theory solely because it employs a tortfeasor. <u>Id.</u>; <u>see</u> <u>also</u> <u>Connick v. Thompson</u>, 563 U.S. 51, 60 (2011) (citation omitted) ("[Municipalities] are not vicariously liable under § 1983 for their employees' actions."). Instead, a municipality may not be found liable "unless action pursuant to official municipal policy of some nature caused a constitutional tort." <u>Monell</u>, 436 U.S. at 691.

But an underlying constitutional tort must be plausibly alleged in order for the municipal action to have caused the injury. In <u>City of Los Angeles v. Heller</u>, 475 U.S. 796 (1986) (per curiam), the plaintiff proceeded to trial on a section 1983 claim against an individual officer who purportedly arrested the plaintiff without probable cause and a <u>Monell</u> claim against the municipality employing him, and the jury returned a verdict in favor of the officer and against the municipality. The district court dismissed the case against the municipality, the Ninth

Circuit reinstated the verdict against the municipality, and the Supreme Court reversed.  "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have <u>authorized</u> the use of constitutionally excessive force is quite beside the point."  <u>Id.</u> at 799.

Here, Franco did not move against the complaint but answered, asserting that "[t]he Second Amended Complaint fails to state any claim against defendant Franco. . . ." (ECF 90 ¶ 118.)  Franco has not waived his right to challenge the claim in, for example, a summary judgment motion.  And, in any case, his actions in not moving against the complaint do not bind his co-defendant, the City.

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  <u>Friend v. Gasparino</u>, 61 F.4th 77, 93 (2d Cir. 2023) (quoting <u>Connick</u>, 563 U.S. at 61).  "Thus, '[t]he elements of a <u>Monell</u> claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right.'"  <u>Id.</u> (quoting <u>Agosto v. New York City Department of Education</u>, 982 F.3d 86, 97 (2d Cir. 2020)).

A municipal liability claim under section 1983 must be premised upon an underlying constitutional violation.  <u>Heller</u>, 475 U.S. at 799.  Plaintiffs assert two claims of violations of their constitutional rights: violation of their due process rights under the Fourteenth Amendment and violation of their Fourth Amendment rights due to malicious prosecution.  For the reasons that follow, both claims fail.

A.  Due Process

Plaintiffs allege that their rights to due process under the Fourteenth Amendment were violated.  (ECF 79 ¶ 80.)  In the Second Amended Complaint and in their opposition brief, plaintiffs assert that their due process rights were violated in at least two ways: that Franco deliberately withheld exculpatory evidence from prosecutors, and that Franco deliberately fabricated false evidence, thus "misleading and misdirecting the criminal prosecutions of Plaintiffs."  (Id. ¶ 79; see also ECF 106 at 15-16.)  Plaintiffs thus appear to be alleging two separate theories under which they claim a violation of their due process rights: a violation of their right to a fair trial and a Brady violation.  The Court will address each in turn.

1.  Right to a Fair Trial

"It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer," including by police officers.  Zahrey v. Coffey, 221 F.3d 342, 355 (2d Cir. 2000) (citations omitted).  "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial . . . ." Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 130 (2d Cir. 1997)).

"To succeed on a fabricated-evidence claim, a plaintiff must establish that 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffe[red] a deprivation of life, liberty, or property as a result.'" Ashley v. City of New York, 992 F.3d 128, 139 (2d Cir. 2021) (alterations in original) (quoting Garnett v. Undercover Officer C0039, 838 F.3d 265, 279

(2d Cir. 2016)).  The plaintiff need not have been tried so long as some deprivation of liberty occurred.  Id. at 138 (citing Ricciuti, 124 F.3d at 130).

Here, plaintiffs allege that they were each prosecuted, sufficiently alleging a deprivation of liberty for purposes of a fabricated evidence claim.  (ECF 79 ¶ 59); see Barnes v. City of New York, 68 F.4th 123, 128 (2d Cir. 2023) (emphasis in original) ("While it is true that claims based on a deprivation of liberty under the Fourth Amendment may require custody or conviction, a Fourteenth Amendment claim based on fabricated evidence does not. . . .The fabricated-evidence claim seeks redress for Barnes's prosecution on the drug sale charge of which he was acquitted and which he plausibly alleges was tainted by fabricated evidence.").  Plaintiffs also allege that their prosecutions were caused by the fabrication of evidence.  (See, e.g., id. ¶¶ 56-57.)  They also allege that an "investigating official," Franco, fabricated information.  (Id. ¶¶ 44, 56, 60, 106, 111.)

But plaintiffs have not established that this fabricated information was likely to influence a jury's verdict, because plaintiffs fail to allege any detail at all about this information. Plaintiffs' claims assert that unidentified evidence was "fabricated," without identifying what the allegedly fabricated evidence was in any of their six prosecutions.  (See, e.g., id. ¶¶ 44, 56, 79, 102, 111.)  Plaintiffs also fail to make any allegations about the circumstances of any of their arrests or the charges for which they were wrongfully convicted—which prevents the Court from determining whether this allegedly fabricated information would have been likely to influence the jury's verdict as to any defendant.  See, e.g., Frost v. New York City Police Department, 980 F.3d 231, 250 (2d Cir. 2020), cert. denied sub nom. City of New York v. Frost, 142 S. Ct. 1666 (2022) (citation omitted) ("[T]here is a triable question as to whether Vega's identification would likely have influenced the jury at Frost's criminal trial given that Vega, unlike McLaurin, was

not Frost's fellow suspect.  These two facts, in turn, create a genuine dispute as to whether

Vega's identification 'critically influenced' the decision to prosecute Frost, thereby resulting in a

deprivation of his liberty.").

       In addition, plaintiffs fail to explicitly allege that Franco forwarded the fabricated

evidence to prosecutors.  Although plaintiffs allege several times that the fabricated evidence

"misle[d] and misdirect[ed] the criminal prosecutions of Plaintiffs," such allegations fall short of

establishing that Franco forwarded false or fabricated information to the prosecutors.  Plaintiffs'

allegations that Franco and other officers "suppressed evidence of their misconduct from the

prosecutor and the defense" and that, but for this misconduct, "the prosecution of Plaintiffs could

not and would not have been pursued" also fall short of claiming that Franco himself actually

forwarded fabricated evidence to the prosecutors.  (ECF 79 ¶¶ 56, 79, 80.)  Thus, plaintiffs'

claim of violation of their right to a fair trial under a fabricated evidence theory fails.

### 2. *Brady* Violation

       "A fair trial claim may also arise where the police or prosecutors withhold

material exculpatory or impeaching evidence from a defendant.  The latter theory of liability is

essentially a civil claim seeking damages for a Brady violation."  Fappiano v. City of New York,

640 F. App'x 115, 118 (2d Cir. 2016) (summary order) (citing Bermudez v. City of New York,

790 F.3d 368, 376 n.4 (2d Cir. 2015)).[6]  "There are three components of a true Brady violation:

The evidence at issue must be favorable to the accused, either because it is exculpatory, or

because it is impeaching; that evidence must have been suppressed by the State, either willfully

---

[6] Although plaintiffs do not allege that the prosecutors knowingly committed a Brady violation, this does not
preclude their bringing such a claim against Franco: "Police officers can be held liable for Brady due process
violations under § 1983 if they withhold exculpatory evidence from prosecutors."  Bermudez, 790 F.3d at 376
(citing Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992)); see also Horn v. Stephenson, 11 F.4th 163,
171 (2d Cir. 2021) (citing Walker, 974 F.2d at 299).

or inadvertently; and prejudice must have ensued." Poventud v. City of New York, 750 F.3d

121, 133 (2d Cir. 2014) (en banc) (citing United States v. Rivas, 377 F.3d 195, 199 (2d Cir.

2004)); see also Brady v. Maryland, 373 U.S. 83, 87 (1963).

Plaintiffs' Brady violation claim against Franco fails. While plaintiffs claim,

without further detail, that Franco withheld and "suppress[ed] exculpatory evidence," (ECF 79

¶¶ 2, 44, 79, 90), they do not identify what that evidence was or why it was exculpatory or

otherwise favorable to them. An allegation that evidence is "exculpatory" without any further

factual detail is conclusory and cannot support a claim for a Brady violation. See, e.g., Hicks v.

Marchman, 719 F. App'x 61, 64 (2d Cir. 2018) (summary order) (affirming dismissal of Brady

claim where, among other factors, plaintiff did "not allege facts sufficient to support a conclusion

that the existence of the second note should be considered exculpatory"); United States v. Walsh,

774 F. App'x 706, 707 (2d Cir. 2019) (summary order) ("Walsh's mere speculation that some

exculpatory or impeachment material may have been withheld is not enough for him to prevail

on appeal.").

In addition, to establish that prejudice ensued from this suppression, plaintiffs

"must show the evidence was material; i.e., whether the 'evidentiary suppression undermines

confidence in the outcome of the trial.'" Fappiano, 640 F. App'x at 118 (quoting Leka v.

Portuondo, 257 F.3d 89, 104 (2d Cir. 2001)). Without any factual allegations about the

fabricated evidence or plaintiffs' convictions, the Court is unable to determine whether that

evidence was material to the cases against them and thus whether prejudice ensued from its

alleged suppression.

Plaintiffs' Brady violation claim therefore fails, along with its fair trial theory.

Thus, plaintiffs' underlying claim of a violation of their due process rights fails.

B.  Malicious Prosecution

To make out a claim for malicious prosecution under section 1983, "a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law."  Manganiello v. City of New York, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted).  The Fourth Amendment protects against unreasonable seizures, and because "the gist of a claim for malicious prosecution is abuse of the judicial process, a plaintiff pursuing such a claim under § 1983 must show that the seizure resulted from the initiation or pendency of judicial proceedings."  Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir. 1997), cert. denied, 522 U.S. 1115 (1998); see also Rohman v. N.Y.C. Transit Authority, 215 F.3d 208, 215 (2d Cir. 2000) (citing Murphy, 118 F.3d at 944–46) (for a malicious prosecution claim under section 1983, plaintiff must assert "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights").

The Court assumes arguendo that all plaintiffs have plausibly alleged a deprivation of liberty under the Fourth Amendment.  Four of the six plaintiffs were held in custody or incarcerated.  (ECF 79 ¶¶ 69-70, 72-73.)  All plaintiffs allege that they were convicted based upon fabricated evidence which, itself, entails a deprivation of liberty.  See Barnes, 68 F.4th at 129 ("[I]t is true that claims based on a deprivation of liberty under the Fourth Amendment may require custody or conviction . . . . ").

However, plaintiffs' malicious prosecution claim still fails.  "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual

malice as a motivation for defendant's actions.'" Manganiello, 612 F.3d at 161 (quoting

Murphy, 118 F.3d at 944) (internal quotation marks omitted).

        Plaintiffs fail to plausibly allege the first element, that Franco initiated or

continued the criminal proceedings against them. "While police officers do not generally

'commence or continue' criminal proceedings against defendants, a claim for malicious

prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an

active role in the prosecution, such as giving advice and encouragement or importuning the

authorities to act.' This element might be satisfied by, for example, showing that an officer

generated witness statements or was regularly in touch with the prosecutor regarding the case."

Bermudez, 790 F.3d at 377 (quoting Manganiello, 612 F.3d at 163). See also Manganiello, 612

F.3d at 163 (quoting Ricciuti, 124 F.3d at 130) ("To initiate a prosecution, a defendant must do

more than report the crime or give testimony. . . . A jury may permissibly find that a defendant

initiated a prosecution where he 'fil[ed] the charges' or 'prepar[ed an] alleged false confession

and forward[ed] it to prosecutors.'"). This "'initiation' requirement" may also be satisfied

"when the plaintiff can establish that police officers forwarded statements to a prosecutor

without sharing that the statements were suspect. Thus, a plaintiff can satisfy the initiation

requirement if he can establish that an indictment 'was produced by fraud, perjury, the

suppression of evidence or other police conduct undertaken in bad faith.'" Dufort v. City of New

York, 874 F.3d 338, 353 (2d Cir. 2017) (citations omitted).

        Here, plaintiffs fall short of explicitly making such allegations. In very broad and

general terms, plaintiffs allege that officers, including Franco, fabricated reports and other

evidence, "which was used to wrongfully prosecute Plaintiffs," and suppressed exculpatory

evidence. (ECF 79 ¶ 44.) They also allege that the charges against them were based on false

evidence fabricated by the defendants and that the defendants suppressed the evidence of such misconduct from the prosecution and defense.   (Id. ¶ 56.)  Finally, plaintiffs further allege that defendants "misle[d] and misdirect[ed] the criminal prosecutions of Plaintiffs" by withholding exculpatory evidence from plaintiffs and the prosecution and by fabricating this false evidence. (Id. ¶ 79.)

But these allegations fall short of pleading that Franco had any sort of "active role" in initiating plaintiffs' prosecutions.  Bermudez, 790 F.3d at 377; Manganiello, 612 F.3d at 163.  There are no allegations in the Second Amended Complaint, for example, that Franco generated witness statements or communicated with the prosecutor about plaintiffs' prosecutions.  See Bermudez, 790 F.3d at 377.  Nor do plaintiffs allege that Franco "brought formal charges and had the person arraigned" or that he "filled out complaining and corroborating affidavits or swore to and signed a felony complaint."  Rutherford v. City of Mount Vernon, 698 F. Supp. 3d 574, 602–03 (S.D.N.Y. 2023) (Krause, M.J.) (quoting Israel v. City of New York, 2018 WL 11219076, at *6 (S.D.N.Y. Sept. 29, 2018) (Gardephe, J.)). Plaintiffs do not state what the false or fabricated evidence was that was "used to prosecute" them, nor do they state that Franco himself took any step to initiate the prosecution with the prosecutors, let alone the concrete and "active" steps required.  This falls short of the standard required to establish this first element.

The Court accepts that each plaintiff has satisfied the second element, favorable termination, based upon the vacatur of their convictions and dismissal of charges by the Bronx and Brooklyn District Attorneys. (ECF 79 ¶¶ 59-66.)  See Thompson v. Clark, 596 U.S. 36, 39 (2022) ("[A] plaintiff need only show that his prosecution ended without a conviction.").[7]  As

---

[7] Applying Thompson, district courts have concluded that a vacated conviction amounts to a favorable termination for a claim of for malicious prosecution.  See, e.g., Panetta v. Cassel, 2023 WL 5803649, at *4 (S.D.N.Y. Sept. 7,

will be demonstrated, plaintiffs have failed to plausibly allege the first, third, and fourth elements and thus have failed to allege an underlying claim of malicious prosecution.

The third factor plaintiffs must establish is a lack of probable cause. "Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Frost, 980 F.3d at 243 (quoting Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003)) (footnote omitted). "The 'existence of probable cause is a complete defense to a claim of malicious prosecution in New York.'" Dufort, 874 F.3d at 351 (quoting Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003)). "Although probable cause to prosecute is a complete defense to a claim of malicious prosecution, such probable cause must be shown as to each crime charged in the underlying criminal action." Kee v. City of New York, 12 F.4th 150, 166 (2d Cir. 2021) (citations omitted).

The Second Circuit has concluded that a presumption of probable cause created by an indictment can be rebutted "at the motion to dismiss stage by alleging that the officers provided fabricated evidence to the prosecutors." Hicks, 719 F. App'x at 65. Plaintiffs have not, in fact, alleged the existence of indictments against them at all, although the Court assumes arguendo that they must have existed, because plaintiffs allege they were each convicted by either the Bronx or Brooklyn District Attorneys. (ECF 79 ¶ 59.) Assuming that indictments were filed against them, however, plaintiffs fail to rebut the presumption of probable cause created by those indictments. Plaintiffs not only fail to provide any factual detail at all about the

---

2023) (Halpern, J.) (footnote and citation omitted) ("Plaintiff's conviction was vacated and the charges against her were dismissed on appeal. This disposition is sufficient to satisfy the favorable termination element of Plaintiff's malicious prosecution claims."); Hincapie v. City of New York, 2022 WL 2870411, at *13 n.28 (S.D.N.Y. July 21, 2022) (Crotty, J.) (citing Thompson, 596 U.S. at 49) ("The Court has already held as a matter of law that the vacatur of Hincapie's convictions—which Defendants do not dispute occurred—satisfies this [second] factor, even though the vacating court found that Hincapie had not established actual innocence. The Supreme Court has subsequently reinforced this conclusion [in Thompson].").

evidence allegedly fabricated by Franco, but they also fail to provide any detail at all about their own arrests, charges, and convictions.

Without these details, it is impossible for the Court to determine what constitutes probable cause in each of the plaintiffs' cases, which plaintiffs must establish for each underlying criminal charge against them.  See Kee, 12 F.4th at 166.  Their bare allegations are not enough to overcome any presumption of probable cause that might have been created by their indictments and convictions.  See, e.g., Lewis v. City of New York, 591 F. App'x 21, 22 (2d Cir. 2015) (summary order) ("Lewis's indictment by a Queens County grand jury creates a presumption of probable cause.  The various iterations of Lewis's complaint fail to rebut this presumption, essentially alleging only that the defendant officers must have fabricated evidence in light of Lewis's version of the events and his ultimate acquittal.  Such conclusory allegations are insufficient to counter the presumption of probable cause, and to allow a court to draw the reasonable inference that the grand jury's indictment was a result of fraud or other misconduct.").

The fourth element of malicious prosecution, actual malice, is related to the third element.  See Ricciuti, 124 F.3d at 131 (citation omitted) ("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment."); De Lourdes Torres v. Jones, 26 N.Y.3d 742, 760 (2016) (citations omitted) ("[T]he plaintiff may show malice and overcome the presumption of probable cause with proof that the defendant falsified evidence in bad faith and that, without the falsified evidence, the authorities' suspicion of the plaintiff would not have fully ripened into probable cause.").  But here, plaintiffs have not sufficiently alleged a lack of probable cause.  Nor are their conclusory allegations as to the fabrication of evidence enough to rebut the presumption of probable cause raised by their indictments.

Plaintiffs attempt to justify the lack of detail in their pleading by asserting that discovery is necessary for them to "unearth[] facts," and that the City should not "benefit from the opaque nature of narcotics investigations, which prevented Plaintiffs from providing more detail of the circumstances of their arrests at the pleading stage." (ECF 106 at 14 (citations omitted).) But the Second Circuit has rejected such arguments from other malicious prosecution plaintiffs. See Lewis, 591 F. App'x at 22 ("We are unpersuaded by Lewis's argument that he was unable to provide more specific allegations in the absence of discovery as to how the indictment was obtained. While such discovery would certainly have been useful, we find it difficult to believe that Lewis was unable to make more specific allegations regarding any fabrication in the State's evidence in the criminal proceeding, where he was present throughout the subsequent trial on the indictment."). As the City notes, plaintiffs were present for their own arrests and prosecutions and could have included factual allegations about them in their complaint—including, at the very least, the year each was arrested and the crimes for which they received convictions. (ECF 108 at 3.) The lack of detail regarding the circumstances of plaintiffs' arrests and the charges against them defeats their attempts to establish that they were arrested without probable cause. Plaintiffs' claim for malicious prosecution therefore fails.

Because both plaintiffs' claims of constitutional violations fail, therefore, there is no underlying constitutional violation to support their Monell claim against the City.

II.    Plaintiffs' *Monell* Claim Also Fails to State a Claim.

Alternatively, plaintiffs' Monell claim fails because, even assuming they had established underlying constitutional violations, plaintiffs have not pleaded facts about their own arrests and convictions to support their conclusory claims of Monell liability against the City.

Plaintiffs attempt to establish their <u>Monell</u> claim in two related ways.[8]  First, they allege a pattern, custom, usage, or informal policy of unconstitutional conduct—falsifying evidence by arresting officers of the NYPD—that was so widespread and permanent that it had the force of an officially adopted policy and that this policy was the cause of plaintiffs' injuries. Second, plaintiffs allege that senior officials of the NYPD had knowledge of an unconstitutional pattern, custom, or usage of arresting officers in falsifying evidence, and that the senior officials were deliberately indifferent to this conduct by failing to discipline the offending officers.[9]  For the reasons described below, plaintiffs' claims fail under each of these theories.

A. <u>Existence of a Municipal Policy or Custom</u>

At the pleading stage, plaintiffs must make factual allegations sufficient to support the inference that a policy, practice, custom or usage exists that encompasses not just their own alleged injuries but a broader pattern of conduct.  <u>See</u> <u>Kimble v. Kingston City School District</u>, 792 F. App'x 80, 82 (2d Cir. 2019) (summary order) (quoting <u>Montero v. City of Yonkers, New York</u>, 890 F.3d 386, 403-04 (2d Cir. 2018)) ("[I]t is settled Second Circuit law that, to prevail under a <u>Monell</u> theory of municipal liability, plaintiffs . . . . must actually allege facts 'tending to support, at least circumstantially,' the inference that the complained-of actions were pursuant to a municipal policy or custom.").  A single incident is generally not sufficient to

---

[8] While certain allegations in the Second Amended Complaint refer to a failure to train theory, plaintiffs assert in their opposition brief that they are only proceeding under theories of a policy or practice of condoning falsification of evidence and failure to discipline.  (ECF 106 at 7.)  Defendants correctly observe that plaintiffs have thus abandoned their failure to train theory of <u>Monell</u> liability.  (ECF 108 at 3-4.)  <u>See</u>, <u>e.g.</u>, <u>Farag v. XYZ Two Way Radio Service, Inc.</u>, 2023 WL 2770219, at *2 (2d Cir. Apr. 4, 2023) (summary order) (quoting <u>Gross v. Rell</u>, 585 F.3d 72, 94 (2d Cir. 2009)) ("[W]e have routinely affirmed the district court's dismissal of a plaintiff's claims when the plaintiff 'did not discuss them in his opposition to [the defendant]'s motion to dismiss.'").

[9] <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 82 (2d Cir. 2012); <u>see also</u> <u>Betts v. Shearman</u>, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013) (Oetken, J.) (citation omitted), <u>affirmed</u>, 751 F.3d 78 (2d Cir. 2014) ("To allege such a policy or custom, the plaintiff may assert . . . a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; <u>or</u> . . . a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees.").

establish such a policy.  (ECF 106 at 7.)  See Lucente v. Cnty. of Suffolk, 980 F.3d 284, 306 (2d Cir. 2020) (citation omitted); East Haven, 691 F.3d at 81.

Plaintiffs' allegations of such a widespread policy or custom fall into several general categories: (1) the 2014 New York City Civilian Complaint Review Board ("CCRB") Report; (2) other cases involving Franco's alleged misconduct; (3) specific allegations regarding falsification of evidence by other NYPD officers; and (4) the 1994 Mollen Commission Report. (ECF 79 ¶¶ 35-42, 103-04, 111-12.)  The Court considers the plausible allegations of plaintiffs and considers those allegations taken as a whole, disregarding those too remote in time, too tangential, or too vague to tend to prove a practice, custom or usage.  See Lynch v. City of New York, 952 F.3d 67, 82 (2d Cir. 2020) ("[W]e view the allegations of the Complaint [regarding Monell liability] in combination rather than piecemeal; and we conclude that the Complaint was sufficient when taken as a whole.").

But considering the various allegations made by plaintiffs as a whole, plaintiffs have still failed to establish a custom or policy claim because they have not provided enough detail about their own arrests and convictions to identify a factually similar pattern, policy, or custom throughout the NYPD.

Plaintiffs cite no facts about the circumstances of their own arrests and prosecutions, except that they took place within a nine-year range from 2006 to 2015; plaintiffs also provide the dates that their convictions were dismissed.  (ECF 79 ¶¶ 53, 61-66.)  But plaintiffs provide no facts about what occurred during their arrests, nor the alleged false statements that were made or the evidence that was falsified.  Without factual allegations, the Court cannot determine, as it must, the contours of the policy that plaintiffs allege exists throughout the NYPD.  Nor can the Court evaluate whether the Second Amended Complaint's

21

citations to other lawsuits, reports, and news articles plausibly support the existence of such a policy.

For example, in East Haven, the Second Circuit compared the factual bases of six incidents of police misconduct cited by the plaintiff to the facts alleged in the plaintiff's case to conclude that such "evidence fell far short of showing a policy, custom, or usage of officers to abuse the rights of black people, and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities" sufficient to support the plaintiff's Monell claim.  East Haven, 691 F.3d at 85.  And in Lynch, the Second Circuit found that the complaint's citation to five pending lawsuits regarding the NYPD's alleged False Observation practice during the "Occupy Wall Street" protests contributed to the plaintiff's claim that his own alleged injuries at a protest were pursuant to the City's practice.  But importantly, the Court also found that "[t]he Complaint contained well-pleaded allegations of fact as to Lynch's conduct that, if accepted as true, precluded the court's rejection of his claims on the ground that there was probable cause for his arrest."  Lynch, 952 F.3d at 80 (emphasis added).

But here, plaintiffs have not included any allegations of fact about their own arrests and convictions, other than they took place at some point between 2006 and 2015 and that Franco fabricated some unidentified evidence in their cases.  The Second Amended Complaint lacks factual allegations that would permit the Court to conclude that any of the allegations about other individuals, such as lawsuits involving NYPD officers other than Franco, reports from the CCRB, the Mollen Report, and other lawsuits involving Franco himself, are similar enough to plaintiffs' own cases that they could plausibly demonstrate a policy, practice, or custom that pervades the NYPD.

The Court has no factual basis about plaintiffs' arrests to compare to the cases cited by plaintiffs of instances in which other persons were arrested and/or convicted based on the alleged falsification of evidence by NYPD personnel other than Franco.  (ECF 79 ¶¶ 35-41.)  Moreover, a careful reading of the complaints in many of these cases reveals that they do not even involve claims of fabricated evidence.  While the cases of Mr. Jacobs, Mr. Tawdeen, and Mr. White all involve allegations of false versions of events given by NYPD detectives that were later refuted (id. ¶¶ 36, 37, 38), other cases cited by plaintiffs do not clearly accuse the NYPD of falsifying evidence.  For example, Mr. Scott's[10] complaint lacks the type of detail that would alert a reader that there was likely merit to a claim of falsification.  The reader cannot discern whether the prosecution was dropped because the officer's observations of what appeared to be crack cocaine were deemed insufficient or because the officer was lying.  (Id. ¶ 39.)  The arrest of Tyreik Williams fares no better.  He was arrested on June 27, 2014 on weapons charges.  The gist of his complaint, which is a matter of record on the dockets of this Court, was that he was visiting an apartment and that a firearm was found in a Timberland shoe box and was not his.  (Id. ¶ 40.)[11]  While Williams' claims of innocence are loud and clear, it is not clear what the lie or falsification was that resulted in his arrest.  Finally, a reader of Ms. Townes' complaint could not discern, other than from conclusory allegations, the extent to which a specific member of NYPD lied or falsified evidence or, perhaps, instead relied upon an unreliable informant.  (Id. ¶ 41.)[12]  Citation to these cases does not plausibly support plaintiffs' claims of a policy of falsification of evidence by NYPD officers.

---

[10] Plaintiffs rely on the arrest of Oshae Scott that allegedly took place on January 14, 2015. (Id. ¶ 39.)  Scott's civil suit was filed on September 9, 2015 in this district.  See Scott v. City of New York, 15-cv-7092 (ECF 1).  The Court takes judicial notice of Scott's allegations not for the truth of their contents but for their possible impact on notice to the City.

[11] See Williams v. City of New York, 15-cv-3123 (ECF 1 ¶¶ 2, 51-52, 57, 134).

[12] See Townes v. City of New York, 16-cv-8543 (ECF 1).

The Court also agrees with the City that 1994 Mollen Commission Report ("Mollen Report"), which plaintiffs refer to in their Second Amended Complaint (id. ¶ 103), is too far attenuated in time from plaintiffs' arrests to support their claim.  (ECF 94 at 12-13.)  That falsification of evidence by police officers has occurred since the Mollen Report's publication does not revive its currency.  Courts in this district have found that the Mollen Report is not relevant to arrests that took place long after the Report's publication.  See, e.g., Breton v. City of New York, 404 F. Supp. 3d 799, 817 (S.D.N.Y. 2019) (Koeltl, J.).  This Court agrees.  The website of the Commission to Combat Police Corruption, created in the wake of the Mollen Report, lists 25 substantive reports released since the Mollen Report.[13]  Cf. Buari v. City of New York, 530 F. Supp. 3d 356, 401–02 (S.D.N.Y. 2021) (Vyskocil, J.) (the Mollen Report has relevance when the underlying arrest or conviction took place around the time of the Report's publication and where the plaintiff's claims are based on facts in the report).

Finally, the cases plaintiffs cite involving Franco and other individuals cannot be considered by the Court because they all occurred after the last arrest of plaintiffs in this case.  (ECF 79 ¶¶ 26-29, 112.)  The earliest of these cases alleges that the arrest by Franco took place in 2016; the most recent arrest is alleged to have taken place in 2018.  (Id. ¶¶ 26-28.)  The City notes, correctly, that these other cases thus postdate plaintiffs' own arrests, which took place from 2006 to 2015.  (ECF 94 at 18-19.)  Allegations relating to cases that postdate plaintiffs' own injuries do not contribute to the plausibility of a pattern, custom or usage that was in existence at the time of plaintiffs' arrests.

---

[13] NYC Commission to Combat Police Corruption, Reports, https://www.nyc.gov/site/ccpc/reports/reports.page (last visited Sept. 12, 2024).  Of course, preceding the Mollen Report, there was the Knapp Commission (1970) and the Seabury Commission (1932).

Plaintiffs also cite a news article published in 2013 describing testimony given by a former NYPD Officer, Genaro Morales, in which Morales allegedly testified that "he and other members of his Bronx Narcotics team fabricated stories about narcotics possession and sale and lied under oath to meet arrest quotas."  (ECF 79 ¶ 42 (quoting Tara Palmeri & Kirstan Conley, Cops 'Lied' to Reach Arrest Quotas, N.Y. POST, Oct. 14, 2013 ("N.Y. POST")).)[14]  The article reports that Morales, a former NYPD detective, "admitted that he knew of cops who lied under oath when he worked in the Bronx narcotics unit from the mid-1990s to 2006."  (N.Y. POST.) The article includes an allegation that the NYPD officers "would 'fabricate stories of drug possession or drug sale in order to get their required number of arrests.'"  (Id.)  The article also reports that this testimony was submitted to the Bronx District Attorney and the police commissioner and that both the District Attorney and the NYPD's Internal Affairs Bureau had acknowledged receipt of the testimony.  (Id.)  Plaintiffs point out that Morales testified about the same unit in which Franco worked—the Bronx Narcotics Bureau—and that this article was published in 2013, during the time period in which one or more plaintiffs were arrested and while Franco was employed in that bureau.  (ECF 106 at 8; ECF 79 ¶ 103.)  But the Second Amended Complaint contains no reference to Franco or other officers being pressured by arrest quotas in the cases of plaintiffs' arrests.

And as to the 2014 CCRB Report, which discussed the increasing rate of "false official statements" made by NYPD officers as of 2014, the Second Amended Complaint identifies the years of plaintiffs' arrests as between 2006 and 2015, and thus it does not necessarily follow that each plaintiff may rely on the information in the 2014 CCRB Report to demonstrate a pattern or practice that affected him.

---

[14] Although plaintiffs do not provide a link to this article, it is publicly available at https://nypost.com/2013/10/14/cops-lied-to-reach-arrest-quotas (last visited Sept. 12, 2024).

Plaintiffs have failed to plausibly allege a policy or practice theory of Monell liability. The Court cannot identify a policy or pattern because it has no facts about plaintiffs' arrests and convictions that it could compare to the other allegations included in the Second Amended Complaint so as to identify a pattern of such misconduct.

### B.  Failure to Discipline

For much the same reasons, plaintiffs' "failure to discipline" theory also fails. Under this theory, plaintiffs allege the City is liable because it consistently failed to investigate a pattern of such complaints or to discipline the officers involved, thus demonstrating deliberate indifference to the officers' conduct and providing them with the tacit understanding that such conduct would be tolerated. (ECF 106 at 11-12; ECF 79 ¶¶ 45-49, 107-109.) Such deliberate indifference may be demonstrated by showing that "the need for more or better supervision to protect against constitutional violations was obvious." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989)). Although not the only way to make such a showing, "[a]n obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." Id. (citations omitted); Amnesty America v. Town of West Hartford, 361 F.3d 113, 127-28 (2d Cir. 2004).

The inquiry focuses on how similar the injuries described in these other cases are to the injuries claimed by plaintiffs and whether they would have placed the City on notice of the recurring issue. See Connick, 563 U.S. at 63 (footnote omitted) ("Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific

training was necessary to avoid this constitutional violation.").  For example, even when plaintiffs claiming nondisclosure of evidence cite to violations in other cases, such allegations cannot support a claim where the type of nondisclosed evidence in the two cases is dissimilar. See Greene v. City of New York, 742 F. App'x 532, 537 (2d Cir. 2018) (summary order) (citing Connick, 563 U.S. at 63) ("[T]he violations Greene cites are inapposite because they do not concern the nondisclosure of the same sort of evidence at issue in this case . . . .").

But here, plaintiffs have not alleged, for example, the crimes they were charged with, the evidence that was allegedly fabricated against them, the circumstances surrounding their arrests, or any other factual predicates that would allow this Court to determine whether the allegations about other violations in the Second Amended Complaint are similar enough to the violations claimed by plaintiffs to show that the City was on notice that discipline was necessary in such specific cases.  And as discussed, the City could not have been put on notice of Franco's misconduct by incidents that occurred after each of the plaintiffs had been arrested.  Nor can the plaintiffs who were arrested from 2006 to 2012 point to the 2014 CCRB Report or the 2013 N.Y. POST article as matters that should have put the City on notice of a problem that caused their own arrests several years before their publication.  See Greene, 742 F. App'x at 536–37 (citing Connick, 563 U.S. at 63 n.7) (alterations in original) ("A plaintiff cannot point to 'contemporaneous or subsequent' violations to 'establish a pattern of violations that . . . provide[d] notice to the cit[y] [that it needed] . . . to conform [its training or supervising program] to constitutional dictates.'").

Because neither of plaintiffs' theories of Monell liability succeeds, and because plaintiffs have failed to establish any underlying constitutional violation, the Court will grant the City's motion to dismiss the Monell claim against it.

III.     Leave to Amend

        In a footnote in their opposition brief, plaintiffs request that if the Court finds that their underlying claims are not sufficiently pleaded, they be given another opportunity to amend their pleading.  (ECF 106 at 12 n.4.)  Because plaintiffs have been given generous opportunities to move to amend within deadlines set and extended by this Court's Orders, have not shown "good cause" for modifying those Orders, and have had a seven-month discovery period before filing their Second Amended Complaint, leave to further amend will be denied.

        Rule 15(a)(2), Fed. R. Civ. P., provides that a "court should freely give leave [to amend] when justice so requires."  But Rule 15 is read in conjunction with Rule 16(a)(1), Fed. R. Civ. P., which establishes "expediting disposition of [an] action" as one of the purposes of a pretrial conference.  Rule 16(b)(3)(A), Fed. R. Civ. P., states that "[t]he scheduling order must limit the time to join other parties [or] amend the pleadings."  A scheduling order "may be modified only for good cause and with the judge's consent."  Rule 16(b)(4), Fed. R. Civ. P.

        In Parker v. Columbia Pictures Industries, the Second Circuit joined other circuits "in holding that despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."  204 F.3d 326, 340 (2d Cir. 2000). The diligence of the moving party is an important factor in determining whether good cause has been shown, but it is not the only consideration.  Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 244 (2d Cir. 2007).  Prejudice to the non-moving party is a relevant consideration, id., but the absence of prejudice is not alone sufficient to demonstrate good cause, Gullo v. City of New York, 540 Fed. App'x 45, 47 (2d Cir. 2013) (summary order).

After this action had been pending for over eight months and the initial complaint once amended, the Court set a date for any further motion to amend or join additional parties as 30 days from the date of the April 10, 2023, i.e., May 10, 2023. (ECF 54.) The parties then requested an extension of the deadline for motions to amend for another month so that plaintiffs could receive and review additional discovery from the City before deciding whether to amend, which the Court granted; this effectively extended the date for motions to amend to June 10, 2023. (ECF 55 & 56.) Plaintiffs filed a motion on June 12, 2023 seeking a further extension of the motion to amend deadline to August 14, 2023, about a 60-day extension. (ECF 59.) While the extension request was pending, the parties jointly agreed on a revised Scheduling Order setting the date for motions to amend for 30 days from the entry of the Revised Scheduling Order. (ECF 61.) Mindful of plaintiffs' earlier request and despite the joint request for a mere 30-day extension, the Court granted a full 60-day extension. (ECF 62.) This further extended the date for a motion to amend the pleadings to September 11, 2023.

On September 11, 2023, the Court entered "Final Revisions to the Civil Case Management Plan and Scheduling Order," granting the parties' request to extend certain discovery deadlines but explicitly stating that the paragraph setting a deadline for motions to amend was not modified. (ECF 73.)[15] In doing so, the Court rejected plaintiffs' request for an additional 60 days for a motion to amend and allowed the date of September 11, 2023 to stand as the deadline for motions to amend. (Id. at 3.) Plaintiffs asked the Court to reconsider its decision not to extend the deadline for amendment, noting their difficulties in complying with N.Y. Gen. Mun. Law § 50-e, a pre-condition to asserting state law claims. (ECF 75.) The Court relented to the extent of granting plaintiffs until December 29, 2023 to seek an amendment to

---

[15] The September 11 Order recited that "[p]aragraphs 1-4 remain as in ECF 62 and are not modified." (Id. at 3.)

add state law claims against any defendant that had been named and served as of June 10, 2023. (ECF 76.)[16]

On November 10, 2023, plaintiff sought leave to file a Second Amended Complaint, arguing that it was necessary in order to add "information . . . based in large part on documents produced by the parties during discovery," and because "[t]he case involves complex issues including a Monell claim[] against the City of New York ('City[']), individual claims of damages pertaining to each of the six plaintiffs, and allegations of misconduct in six police investigations that took place between 2006-2015."  (ECF 77 at 1.)  The Court implicitly found "good cause" for an amendment after the expiration of the deadline for filing a motion to amend and allowed plaintiffs to file the Second Amended Complaint, which was filed on November 17, 2023.  (ECF 78 & 79.)

After plaintiffs filed the Second Amended Complaint, the City filed a letter seeking leave to file a motion to dismiss and outlining the arguments in their anticipated motion. (ECF 80.)  The City argued that the Monell liability allegations in the Second Amended Complaint were "conclusory," "not clearly pled," and "boilerplate allegations," and noted that to establish a Monell claim, plaintiffs needed to prove a deprivation of a constitutional right.  (Id. at 2.)

In response, plaintiffs filed an untimely letter (ECF 81) responding to the City's pre-motion letter, specifically responding to the City's argument that "Monell claims might require detailed allegations" and acknowledging that they had to "'allege sufficient factual detail' that goes beyond boilerplate allegations."  (Id. at 3.)  They did not seek further leave to amend prior to the filing of the motion, although the undersigned's Individual Practices invited them to

---

[16] Plaintiffs ultimately informed the Court that they did not plan to seek leave to amend to add state law claims. (ECF 85.)

do so.  Individual Practices at ¶ 3(A)(iv) & (v).  Plaintiffs did not insulate themselves from the strictures of the "good cause" requirement of Rule 16(b)(4) by a self-serving statement that "Plaintiffs would seek leave to file a further amended complaint as appropriate under Fed. R. Civ. P. 15(a)(2) and this Court's Local Rules and Individual Practices."  (ECF 83 at 1.)

Plaintiffs sought, and received, several opportunities to seek further amendments to their complaint, and they were on notice of the City's argument that their Monell claim, an element of which is an underlying constitutional violation, was not sufficiently pleaded before the filing of the motion to dismiss and could have sought to amend before the filing of the motion.

As noted, plaintiffs' request to amend was included in a footnote in the middle of their opposition brief.  (ECF 106 at 12 n.4.)  The Second Circuit has affirmed a district court's denial of leave to amend when such a request "appeared in a footnote in the middle of [plaintiffs'] brief opposing the defendants' motion to dismiss—because the request was buried and because it was, in any event, futile."  In re Tamoxifen Citrate Antitrust Litigation, 466 F.3d 187, 220 (2d Cir. 2006), abrogated on other grounds by F.T.C. v. Actavis, Inc., 570 U.S. 136 (2013).  See also id. (citations omitted) ("It is within the court's discretion to deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss."); Corsini v. Nast, 613 F. App'x 1, 4 (2d Cir. 2015) (summary order) (citing In re Tamoxifen, 466 F.3d at 220) ("[T]he district court did allow Corsini to amend his complaint; he filed a first amended complaint and never formally moved to amend that complaint.  Instead, he merely raised the prospect of a second amendment in his opposition to the motion to dismiss.  The district court did not abuse its discretion by not addressing this vague allusion to a possible second amendment."); Surrey Propco LLC v.

Denihan Ownership Co., LLC, 2023 WL 4553551, at *3 (2d Cir. July 17, 2023) (summary order)

(citing Porat v. Lincoln Towers Community Association, 464 F.3d 274, 276 (2d Cir. 2006))

("Propco did not formally move for leave to amend the complaint but argued on the last page of

its opposition to Denihan's motion for judgment on the pleadings that, if the motion were

granted, Propco should be given leave to amend.  It did not advise the district court how the

complaint's defects would be cured, and we thus find no abuse of discretion in the district court's

entry of judgment without giving Propco leave to amend.").

       Plaintiffs have had the atypical circumstance of a seven-month period for

discovery prior to the filing of Second Amended Complaint and a more extended period prior to

the filing of the motion to dismiss.  (ECF 54, 79 & 92.)  The Court denies plaintiffs' request for

leave to further amend.

IV.    <u>Plaintiffs' Motion to Join Crossclaims Will Be Granted.</u>

       Finally, the Court will address plaintiffs' pending motion to join in Franco's

crossclaims against the City.  In his answer, Franco asserted three crossclaims against the City,

asserting that any liability to plaintiffs and any costs incurred by Franco in defending this suit

must be assumed by the City pursuant to New York General Municipal Law § 50-k.  (ECF 121 at

1; ECF 90 ¶¶ 128-33.)  Plaintiffs assert that they have an interest in the outcome of Franco's

indemnification claim against the City and seek permissive joinder of these crossclaims under

Rule 20, Fed. R. Civ. P.  (ECF 121.)  Franco takes no position on this motion, while the City

opposes it, although it has not submitted any opposition briefing on this issue.  (Id. at 1.)

       Rule 20(a), Fed. R. Civ. P., allows persons to join an action as plaintiffs if "(A)

they assert any right to relief jointly, severally, or in the alternative with respect to or arising out

of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." See also Abraham v. Volkswagen of America, Inc., 795 F.2d 238, 251 (2d Cir. 1986). First, "[i]n determining whether claims arise out of the same transaction or occurrence, the Second Circuit advises the court to assess whether the 'essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" Gittens v. City of New York, 2011 WL 10618708, at *2 (S.D.N.Y. May 11, 2011) (Crotty, J.) (quoting United States v. Aquavella, 615 F.2d 12, 22 (2d Cir. 1979)). The Court concludes that this inquiry is satisfied here. As plaintiffs assert, Franco's crossclaims against the City for indemnification are logically connected to their claims against Franco for due process violations and malicious prosecution; they arise out of the same series of events (i.e., plaintiffs' arrests and convictions) and require the same essential facts and discovery. (ECF 121 at 1-2.)

Second, common questions of fact and law exist in plaintiffs' claims against Franco and in Franco's crossclaim for indemnification against the City. See, e.g., Agnesini v. Doctor's Associates, Inc., 275 F.R.D. 456, 460 (S.D.N.Y. 2011) (Maas, M.J.) (concluding that common questions of law or fact existed where, among other reasons, "one overarching question of law common to both Plaintiffs' claims" was whether defendant could be held vicariously liable for their injuries, and where, "[i]n order to answer that question, the parties necessarily will need to explore the nature of [defendant's] relationship with its franchisees to determine" certain factual matters).

The Court will therefore grant plaintiffs' motion to join in Franco's crossclaims. (ECF 121.)

CONCLUSION

        The Court GRANTS the City's motion to dismiss the <u>Monell</u> claim against it. The Court GRANTS plaintiffs' motion to join in Franco's crossclaims against the City. The Clerk of Court is respectfully directed to terminate the motions (ECF 121, ECF 92).

        SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:       New York, New York
              September 13, 2024